Stephanie D. Curtis
  Texas State Bar No. 05286800
Mark A. Castillo
  Texas State Bar No. 24027795
Jeff Carruth
  Texas State Bar No. 24001846
THE CURTIS LAW FIRM, PC
901 Main Street, Suite 6515
Dallas, Texas 75202
Telephone: 214.752.2222
Facsimile: 214.752.0709

COUNSEL FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE** | § | |
| | § | **Case No. 07-41650** |
| **TEXAS WYOMING DRILLING INC.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | **HEARING DATE AND TIME:** |
| | § | **May 10, 2007 at 11:00 a.m.** |

## EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY LIENS PURSUANT TO SECTIONS 105(a) AND 364(d) OF THE BANKRUPTCY CODE; AND (III) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULES 2002, 4001 AND 9014

TO THE HONORABLE D. MICHAEL LYNN, UNITED STATES BANKRUPTCY JUDGE:

Texas Wyoming Drilling, Inc., Debtor and Debtor-in-Possession ("TWD" or the "Debtor"), in the above-captioned Chapter 11 case (the "Bankruptcy Case"), herein submits this *Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Incur Postpetition Secured Indebtedness, (II) Granting Security Interests and Superpriority Liens Pursuant to Sections 105(a) and 364(d) of the Bankruptcy Code; and (III) Scheduling a Final Hearing on the Motion Pursuant to Bankruptcy Rules 2002, 4001 and 9014* (the "Motion"), and in support thereof would show the following.

EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY LIENS PURSUANT TO
SECTIONS 105(a) AND 364(d) OF THE BANKRUPTCY CODE; AND (III) SCHEDULING A FINAL HEARING ON THE MOTION
PURSUANT TO BANKRUPTCY RULES 2002, 4001, AND 9014 — Page 1 of 17

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. Consideration of this action is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § 1408 and 1409.

## II.      PROCEDURAL BACKGROUND

2.      On April 16, 2007 (the "Petition Date"), the Debtor commenced this Bankruptcy Case by filing its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

3.      The Debtor continues to operate its businesses as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committees have been appointed in the Bankruptcy Case.

4.      This case is designated a complex case under the Procedures for Complex Chapter 11 Cases, pursuant to the Order Granting Complex Case Treatment entered on April 23, 2007 (the "Complex Case Order").

## III.      FACTUAL BACKGROUND

**A.  The Debtor's business operations and cash needs.**

5.      The Debtor maintains its corporate offices and principal place of business at Brock, Texas which location has the mailing address of 1421 F.M. 1189, Suite 7, Weatherford, Texas 76087.

6.      The Debtor's business operations consist of three components: (1) the operation of oil and natural gas drilling rigs for hire; (2) the partial ownership of a specialty oil field services business called Snubbing Solutions, L.P., and (3) investments in oil and natural gas wells as a working interest owner.

## *1. Drilling operations.*

7.     The Debtor's original business activity upon its formation consisted of the operation of drilling rigs in Texas.  Today, the principal, income generating component of the Debtor's business activities is the operation of seven (7) drilling rigs in Wyoming.

8.     As of May 4, 2007, the Debtor maintains approximately 28 full time employees in Wyoming who work in connection with the drilling rigs.

9.     All of the Debtor's Wyoming drilling rigs currently are utilized at full daytime capacity under a drilling contract between the Debtor and Williams Production RMT Company ("Williams"). The Debtor incurs in the ordinary course of operating the drilling rigs all of the usual and customary expenses associated with the operation of such a business, including, but not limited to obligations for payroll, employee benefits, workers compensation, property and liability insurance, automobile payments, safety and environmental consultation, and maintenance and repairs of equipment.

10.     The Debtor ordinarily has sufficient resources to pay all of the expenses arising from the operation of the drilling rigs by the revenue generated from the Williams drilling contract.  However, the Debtor has recently experienced fluctuations in its stream of receivables resulting from the Williams drilling contract, and the timely receipt of payments, because of inclement weather conditions and temporary environmental restrictions on drilling which interrupted operations during March and April, 2007.

11.     The interruptions in the Williams revenue stream coupled with the administrative expenses incurred and to be incurred in connection with this Chapter 11 reorganization require that the Debtor obtain a postpetition credit facility.

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY LIENS PURSUANT TO SECTIONS 105(a) AND 364(d) OF THE BANKRUPTCY CODE; AND (III) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULES 2002, 4001, AND 9014 — Page 3 of 17**

## *2.  Working interests in oil and gas wells.*

12.     The Debtor owns a 12.5% working interest in 6,190.20 net mineral acres leased by Reichmann Petroleum Corp. ("Reichmann")[1] in Johnson, Tarrant, Denton, and Parker Counties and within the boundaries of the Barnett Shale formation in North Texas (the "Working Interest Assets").[2]  At present, approximately twenty-seven (27) wells in various stages of completion and operation are located on the Working Interest Assets.

13.     The Debtor is a party to a joint operating agreement (the "JOA") covering the Working Interest Assets.  Under the JOA, TWD is obligated to pay its proportional share of expenses incurred in the development and subsequent operation of the wells which are among the Working Interest Assets.

14.     Although TWD's obligations to make payments under the JOA for the Working Interests Assets are not currently expensed by the Debtor pending the disposition of several controversies with Recihmann, TWD could be called upon during the course of this Bankruptcy Case to pay its share of expenses under the JOA or face the prospect of motion practice and other litigation to enforce the JOA-related obligations against the Working Interest Assets and TWD, thus potentially resulting in a diminution of the estate.[3]

15.     Among the Working Interest Assets are four (4) wells (the "Harding Wells") which are the subject of a proposed agreement (the "Participation Agreement") to replace

---

[1] Reichmann is currently the debtor and debtor in possession in Case No. 06-20804 currently pending in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Reichmann Bankruptcy Case.")

[2] Due to the condition of the books and records of the Debtor and the books and records of Reichmann, it is possible that TWD owns more working interests, or other oil and gas investments, other than those described herein.

[3] *See, e.g.*, the *Amended Motion of the Debtor for an Order to Establish Procedures for Collection of Proceeds from Sale of Oil and Gas, Payment to interest Owners, Assessment of Joint Interest Billings, Exercise of Debtor's Set-Off Rights, and Assignment of Interests in Leases to Unassigned Interest Owners* (Docket No. 178) in the Reichmann Bankruptcy Case.  TWD also believes that Reichmann cannot account for $1 million in prepaid expenses remitted by TWD under the JOA, and/or the $1 million was used purposes other than payment of operating expenses.

Reichmann with the Harding Company ("Harding") in the role of operator of the Harding Wells. The Participation Agreement provides for TWD and the other working interest parties thereto to pay for the expenses to be incurred in completion of the Harding Wells pursuant to new operating agreements by and between TWD (and the other working interest parties) and Harding. Approval to enter into the Participation Agreement is the subject of a separate motion filed by TWD contemporaneously with the filing of this Motion on May 4, 2007 and filed as Docket No. 47 in the Bankruptcy Case (the "Participation Motion").

16.     As described in further detail in the Participation Motion, an emergency need for a cash infusion to enable TWD to pay its share of expenses to Harding as the going forward operator of the Harding Wells is necessary to preserve the value of the Harding Wells. The deadline for the completion of each of the Harding Wells as a well producing in paying quantities occurs within the next 30 to 60 days.  TWD must fulfill its obligations under the Participation Agreement and the applicable going forward operating agreements to pay its proportionate share of the expenses necessary to attempt completion of the Harding Wells. Fulfillment of TWD's obligations will permit TWD to attempt to preserve (i) the value of the Harding Wells and (ii) the potential revenues from the Harding Wellsas important assets of TWD's estate.

17.     In order to fulfill its obligations under the Participation Agreement and the applicable operating agreements, TWD estimates that approximately $300,000.00 must be paid within the next ten (10) days so that Harding, as the going forward operator of the Harding Wells, may immediately commence and expedite the work necessary to attempt completion of the Harding Wells before the deadline in each of the applicable leases for the Harding Wells to achieve production in paying quantities.  Naturally, if production in paying quantities is not

achieved before the applicable deadlines, TWD and the other working interest owners could lose

the value of the Harding Wells because the underlying leases will terminate and ownership of the

mineral interests shall revert back to the original lessors.

**B.  The proposed debtor in possession financing.**

18.    The Debtor requires an immediate source of credit in order to conduct its ordinary

business operations, consisting of the operation of the Wyoming drilling rigs, and to pay the

obligations associated therewith.

19.    The Debtor also requires an immediate source of credit in order to fulfill its

obligations in connection with the Working Interest Assets, and in particular with the emergency

need for the funding necessary to attempt completion of the Harding Wells.

20.    The Debtor has identified  FairPlay Gas Holdings, LLC  (the "DIP Lender") as a

lender willing and able to provide debtor in possession financing to TWD, provided that (1) the

Debtor obtain approval of the proposed order attached to this Motion as **Exhibit 1**[4] and

incorporated by reference herein (the "DIP Order"), and (2) obtain through the DIP Order

authorization to enter into, incur debt, and grant superpriority security interests and liens, in to,

and against property of the estate, as described in the (a) *Working Capital Debtor in Possession*

*Loan Agreement* and the terms and conditions described therein (the "Operating DIP"), in the

form attached hereto as **Exhibit 2**[5] and incorporated by reference herein, and (b) the *Lease*

*Participation Debtor in Possession Loan Agreement* and the terms and conditions described

therein (the "Lease Participation DIP"), in the form attached hereto as **Exhibit 3**[6] and

---

[4] *See* Paragraph No. 36, *infra*, regarding filing and service of Exhibit 1.

[5] *See* Paragraph No. 36, *infra*, regarding filing and service of Exhibit 2.

[6] *See* Paragraph No. 36, *infra*, regarding filing and service of Exhibit 3.

incorporated by reference herein. (The Operating DIP and the Lease Participation DIP are collectively referred to hereinafter as the "DIP Credit Agreements.")

21.     Under the Operating DIP, the DIP Lender will provide to the Debtor a revolving line of credit up to $2 million, which loan will be secured by a blanket priming lien in, to, and against, all of the Debtor's personal propertyand all accounts, products, and proceeds arising from the Debtor's personal property, but excluding  all mineral interests owned by the Debtor and all interests of the Debtor in any mineral lease or any oil or gas well, including the Working Interest Assets, and the Operating DIP otherwise shall be non-recourse as to the Debtor and the property of the estate. (The Debtor currently owns eight (8) drilling rigs consisting of the drilling rigs in operation in Wyoming, and one drilling rig in storage in the Houston area.)  In addition, the outstanding balance of principal, interest, and other charges permitted under the Operating DIP may be reduced by $1,000,000 in exchange for 60% of all outstanding shares of stock of the reorganized debtor (or other ownership units if the reorganized debtor emerges from bankruptcy as an entity other than a corporation), if so elected by the DIP Lender prior to the effective date of the Debtor's plan of reorganization (the "Equity Kicker.").

22.     The Operating DIP shall be available to the Debtor to finance operating expenses and short term capital needs, including administrative expenses incurred by the Debtor and allowed by the Court during the course of the Bankruptcy Case.  The Operating DIP may also be used as exit financing to fund initial distributions to creditors under the Debtor's plan.

23.     Under the Lease Participation DIP, the DIP Lender will provide to the Debtor a revolving line of credit up to $6 million, which loan shall be structured as a mezzanine credit facility, secured by all real property and mineral interests owned by the Debtor and all interests of the Debtor in any mineral lease or any oil or gas well, including the Working Interest Assets,

and all accounts, products, and proceeds arising therefrom, but otherwise non-recourse as to the Debtor and the property of the estate. In addition, the DIP Lender will be entitled to a net profit interest equal to 40% of all of the net operating cash flow the Debtor receives from the Working Interest Assets, including but not limited to the Harding Wells (the "Net Profit Interest").

24.    The Lease Participation DIP shall be available to the Debtor to finance the Debtor's obligations with regard to the Working Interest Assets, including the emergency need for funds to assist in the completion of the Harding Wells, and any other obligations incurred by the Debtor post-petition under the applicable JOA for the Working Interest Assets.

25.    The general terms upon which the Debtor proposes to enter the DIP Credit Agreements are summarized below.

| OPERATING DIP | |
|---|---|
| Maximum amount of loan | $2,000,000.00 |
| Initial advance | $250,000.00 |
| Maximum subsequent advances | $50,000.00 |
| Maximum frequency of advances / minimum time between advances, unless DIP Lender agrees otherwise | 14 days |
| Revolving line of credit | Yes |
| Interest Rate | 12%, per annum |
| Closing / transaction fee (To be paid to DIP Lender from first advance) | $20,000.00 |
| Term / Maturity | The earlier of confirmation of a Plan or one year from the effective date of the loan. |
| Payment obligation prior to maturity | Interest only, paid monthly. |
| Collateral | All drilling rigs of the Debtor, and related equipment, and all accounts, products, and proceeds thereof. |
| Other terms | Credit facility is secured by the drilling rigs and all related collateral, but is otherwise non-recourse as to the Debtor. Equity Kicker (as described above). |

EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY LIENS PURSUANT TO SECTIONS 105(a) AND 364(d) OF THE BANKRUPTCY CODE; AND (III) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULES 2002, 4001, AND 9014  — Page 8 of 17

| LEASE PARTICIPATION DIP | |
|---|---|
| Maximum amount of loan | $6,000,000.00 |
| Initial advance[7] | $600,000.00 |
| Maximum subsequent advances, unless Lender agrees otherwise | No limit. |
| Maximum frequency of advances / minimum time between advances, unless Lender agrees otherwise | As needed. |
| Revolving line of credit. | Yes. |
| Interest Rate | One year LIBOR + 7 percent, per annum |
| Closing / transaction fee (to be paid to DIP Lender from first advance) | $50,000.00 |
| Term / Maturity | The earlier of confirmation of a Plan or three years from the effective date of the loan. |
| Payment obligation prior to maturity | Interest only, paid monthly. |
| Collateral | All of the Debtor's real property and mineral interests including the Working Interest Assets. |
| Other terms. | Credit facility is secured by the Working Interest Assets, but is otherwise non-recourse as to the Debtor.  DIP Lender shall be entitled to a Net Profit Interest equal to 40% of all net operating cash flow the Debtor receives from the Working Interest Assets. |

26.   In addition to the terms and conditions described above, the DIP Lender has conditioned the extension of credit under the Lease Participation DIP upon the Debtor's agreement to enter into, and obtaining Court approval of, the Operating DIP, including the Equity Kicker.

---

[7] The initial advance under the Operating DIP and the Lease Participation DIP are collectively referred to hereinafter as the "Initial Advances."

27.     The Debtor discloses that the President of the DIP Lender is R. Kevin Russell ("Russell"), who is the Designated Restructuring Officer of the Debtor and a Director on the Debtor's Board of Directors.   Neither Russell nor any entity in which Russell directly or indirectly owns a majority interest is a prepetition creditor or shareholder of the Debtor.  Russell is the president of the corporate general partner of a prepetition lender of the Debtor, Eastman-Sabine Pipeline Partners, L.P. ("Eastman-Sabine"), and Russell is the President and shareholder of a limited partner of Eastman-Sabine.

28.     The Debtor requires immediate access to the initial advances the DIP Lender is prepared to make available under each facility.

29.     The Debtor requires immediate access to the initial advance to be provided under the Operating DIP in order to maintain ordinary operations and provide sufficient liquidity so that the Debtor may safely satisfy, for example, payroll obligations for the remainder of the month of May, 2007, all payments necessary to pay adequate protection to the holder of the premium finance notes for the Debtor's liability and property insurance policies, and all payments necessary to maintain medical, dental, life and accident, and supplemental insurance plans for the benefit of the Debtor's employees.

30.     The Debtor requires immediate access to the initial advance to be provided under the Lease Participation DIP so that the Debtor may meet the emergency expenses associated with the Participation Agreement and the Harding Wells, as described above and as described in the Participation Motion.

## IV.     <u>RELIEF REQUESTED</u>

31.     By this Motion the Debtor respectfully seeks pursuant Bankruptcy Code sections 105(a) and 364(d) and Bankruptcy Rules 2002, 4001, and 9014:

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY LIENS PURSUANT TO
SECTIONS 105(a) AND 364(d) OF THE BANKRUPTCY CODE; AND (III) SCHEDULING A FINAL HEARING ON THE MOTION
PURSUANT TO BANKRUPTCY RULES 2002, 4001, AND 9014  — Page 10 of 17**

A.    an emergency hearing to consider the entry of an order (the "Interim DIP Order")

to:

    i.    authorize and approve the Initial Advances and the provisions of the DIP

       Credit Agreements, up to the amounts of the Initial Advances; and

    ii.    accord, pursuant to Bankruptcy Code section 364(d), superpriority status

       to the postpetition security interests provided under the DIP Credit

       Agreements;

B.    under Bankruptcy Rule 4001, the setting of a final hearing on this Motion by the

Court, to consider entry of the Interim DIP Order as a final order; and

C.    following the final hearing, the entry of a final order that

    i.    approves the DIP Credit Agreements in their entirety, up to the maximum

       amount of each loan, and

    ii.    accords, pursuant to Bankruptcy Code section 364(d), superpriority status

       to the postpetition security interests provided under the DIP Credit

       Agreements.

32.    As stated above, a proposed form of Interim DIP Order is attached hereto as

**Exhibit 1** and is incorporated by reference herein.

## V.    BASIS FOR RELIEF

33.    The Debtor has determined that the DIP Credit Agreements are necessary for the

Debtor to operate its business in Chapter 11 and for the Debtor's successful reorganization.  The

Operating DIP will allow the Debtor to maintain the drilling operations and the performance of

the Williams drilling contract without interruption.  The Lease Participation DIP will allow the

Debtor to fulfill its obligations and to meet the emergency funding necessary to protect the

Harding Wells and to satisfy, if and when necessary, the Debtor's share of the costs of completion and production of the other wells among the Working Interest Assets.

34.    The Debtor has sought debtor in possession credit from alternative sources, but the Debtor has been unable to identify a lender willing to provide the Lease Participation DIP on terms as favorable as those provided herein by the DIP Lender, especially considering the inherent risk involved in financing oil and gas exploration and the possibility that any wells which are completed will not result in production in paying quantities, coupled with the various issues pertaining to the mineral interests raised by the Reichmann Bankruptcy Case.

35.    The DIP Lender has conditioned the extension of the Operating DIP on the Debtor entering into and obtaining approval of the Lease Participation DIP.  The Debtor has agreed to such terms, in its sound business judgment, because of the favorable terms of the Lease Participation DIP and the extremely accelerated time frames in which the DIP Lender has made credit available to the Debtor under both facilities.  (The DIP Lender will make the full amount of the Initial Advances available to the Debtor at the conclusion of the emergency hearing on this Motion.)  Although it may be possible for the Debtor to obtain an operating line of credit from another lender on terms roughly comparable to terms of the Operating DIP, the Debtor is of the opinion that the favorable terms of the Lease Participation DIP provide an aggregate, net benefit to the estate when coupled with the maximum loan available under the Operating DIP. Moreover, the Debtor knows of no lender other than the DIP Lender who would be capable of providing financing within the same expedited time frames as provided by the DIP Lender or in sufficient amounts to meet the immediate, critical needs of the Debtor.

36.    As of the date of the filing of this motion, the negotiations concerning the principal business terms of the DIP Credit Agreements have been completed as set forth above.

However, the documentation regarding the DIP Credit Agreements has not yet been completed and is in the process of being finalized.  Accordingly, the Debtor has filed this Motion and a Notice of Hearing on Friday, May 4, 2007, seeking an emergency hearing regarding interim approval of the DIP Credit Agreements on Thursday, May 10, 2007, and the Debtor anticipates that it will file as exhibits to this Motion substantially completed DIP Credit Agreements, and a proposed order, on or before Wednesday, May 9, 2007, so that the DIP Credit Agreements shall be immediately available to ECF filers in this case.  The Debtor shall also notify the parties on the Debtor's shortened service list who are not ECF filers in this case, and for whom the Debtor does not have an electronic mail address, of the ability to acquire copies of the DIP Credit Agreements from the Debtor on an expedited basis.

37.    Section 364(d) of the Bankruptcy Code provides:

(d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

38.    The Debtor has been unable to procure the required funds in the form of unsecured credit or unsecured debt with an administrative priority.  Accordingly, under the circumstances, the Debtor should be authorized to enter into a secured financing arrangement under section 364(d) of the Bankruptcy Code.

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY LIENS PURSUANT TO SECTIONS 105(a) AND 364(d) OF THE BANKRUPTCY CODE; AND (III) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULES 2002, 4001, AND 9014 — Page 13 of 17**

39.    The pre-petition secured creditors of the Debtor, Charlie Lawrence and Eastman-Sabine Pipeline Partners, Ltd., both consent to the terms and conditions of the DIP Credit Agreements, including the super-priority liens.

40.    Having determined that financing was available only under section 364(d) of the Bankruptcy Code, the Debtor negotiated the DIP Credit Agreements at arms' length and pursuant to its business judgment, which is to be accorded great weight so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code.[8]

41.    The postpetition financing extended through the DIP Credit Agreements is clearly for the benefit of the Debtor's estate and creditors.  The Operating DIP will allow the Debtor to maintain operations, and provide reassurance to Williams and the Debtor's employees and vendors, thereby helping to promote the Debtor's successful reorganization.  The Lease Participation DIP will preserve the future income potential of the Working Interest Assets, particularly with respect to the Harding Wells.  The Equity Kicker feature of the Operating DIP shall not affect the treatment of any creditor of the estate under the Debtor's plan.  The Net Profit Interest feature of the Lease Participation DIP is a standard feature of loans of such kind, and the Debtor is obtaining the Lease Participation DIP with an Equity Kicker set at a ratio that is below industry norms for such loans and otherwise on terms more favorable than could otherwise be achieved even if the time frame to apply for and close such a loan was not expedited.  Accordingly, this Court should authorize the Debtor to obtain the postpetition financing as evidenced by the DIP Credit Agreements to the extent and pursuant to the terms contained herein and in the proposed Interim DIP Order.

---

[8] *See In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

42.   The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated by the parties in good faith and at an arms' length.  Accordingly, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Credit Agreements.

43.   Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain postpetition financing on an interim and final basis and provides in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

44.   Accordingly, upon request, the Court is empowered to conduct a preliminary expedited hearing on the Motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

45.   Accordingly, the Debtor requests, pursuant to Bankruptcy Rules 4001 (c), that the Court authorize the Debtor from and after the entry of the Interim DIP Order until a final hearing on the Motion to obtain credit under the DIP Credit Agreements up to the amount of the Initial Advances.  This will enable the Debtor to maintain ongoing operations, preserve the value of the Harding Wells, and provide the means by which the Debtor may avoid immediate and irreparable harm and prejudice to the estate and all parties-in-interest, pending the final hearing.

## VI.   NOTICE

46.   The Debtor shall serve a copy of this Motion and a notice of hearing upon the short service list authorized by the Complex Case Order by facsimile, electronic mail, or other expedited delivery.

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY LIENS PURSUANT TO SECTIONS 105(a) AND 364(d) OF THE BANKRUPTCY CODE; AND (III) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULES 2002, 4001, AND 9014  — Page 15 of 17**

## VII.    <u>PRAYER</u>

WHEREFORE, PREIMISES CONSIDERED, the Debtor respectfully requests that the Court (i) grant the Motion and the relief requested herein; (ii) enter an order approving the DIP Credit Agreements according to the terms stated therein on an interim basis, and thereby authorize and approve the Initial Advances to avoid immediate and irreparable hard to the estate; (iii) accord, pursuant to Bankruptcy Code section 364(d), superpriority status to the postpetition security interests provided under the DIP Credit Agreements; and (iv) set a final hearing on this Motion.  The Debtor requests such other and further relief to which it is entitled at law or in equity.

Dated: May 4, 2007                              Respectfully submitted,

                                                /s/ Jeff Carruth
                                                Stephanie D. Curtis
                                                Texas State Bar No. 05286800
                                                Mark A. Castillo
                                                Texas State Bar No. 24027795
                                                Jeff Carruth
                                                Texas State Bar No. 24001846

                                                THE CURTIS LAW FIRM, PC
                                                901 Main Street, Suite 6515
                                                Dallas, Texas  75202
                                                Telephone: 214.752.2222
                                                Facsimile: 214.752.0709

                                                COUNSEL FOR DEBTOR AND
                                                DEBTOR-IN-POSSESSION

## CERTIFICATE OF CONFERENCE

On May 4, 2007, counsel for the Debtor communicated with Erin Schmidt of the United States Trustee's office with respect to the foregoing motion, and in the communication Ms. Schmidt reserved the rights of the United States Trustee pending a review of the Motion and the loan documents forthcoming from the Debtor; however, the Trustee does not oppose the emergency setting requested for May 10, 2007.

/s/ Jeff Carruth
Jeff Carruth

## CERTIFICATE OF SERVICE

This is to certify that, on this 4th day of May 2007, a true and correct copy of the foregoing document has been served on all parties listed on the attached Debtor's most updated Complex Chapter 11 Service List by email or facsimile where known, and otherwise by overnight mail, and also upon all parties receiving ECF notification.

/s/ Jeff Carruth
Jeff Carruth

**EXHIBIT 1**

**EXHIBIT 1 TO BE SUPPLIED,
SEE PARAGRAPH NO. 36 OF THE MOTION.**

**EXHIBIT 2**

**EXHIBIT 2 TO BE SUPPLIED,
SEE PARAGRAPH NO. 36 OF THE MOTION.**

**EXHIBIT 3**

**EXHIBIT 3 TO BE SUPPLIED,
SEE PARAGRAPH NO. 36 OF THE MOTION.**