Stephanie D. Curtis
  Texas State Bar No. 05286800
Mark A. Castillo
  Texas State Bar No. 24027795
Jeff Carruth
  Texas State Bar No. 24001846
**THE CURTIS LAW FIRM, PC**
901 Main Street, Suite 6515
Dallas, Texas  75202
Telephone: 214.752.2222
Facsimile:  214.752.0709

COUNSEL FOR THE REORGANIZED DEBTOR

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Case No. 07-41650** |
| **TEXAS WYOMING DRILLING, INC.,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | **Hearing Date and Time:** |
| | § | **February 25, 2009 at 1:30 p.m.** |

## DEBTOR'S CONSOLIDATED OBJECTION TO THE
## FINAL FEE APPLICATIONS FILED BY COMMITTEE PROFESSIONALS

TO THE HONORABLE D. MICHAEL LYNN,
UNITED STATES BANKRUPTCY JUDGE:

The Reorganized Debtor (the "Debtor") hereby files its Consolidated Objection (the

"Objection") to the Final Fee Applications (collectively, the "Committee Applications") filed by

the Official Committee of Unsecured Creditors' (the "Committee") Professionals, including (1)

Poyner Spruill LLP ("Poyner"), (2) Nelson Mullins Riley & Scarborough LLP ("Nelson"), (3)

Harris, Finley & Bogle, PC ("HFB"), and (4) Mr. Don Davis and Harris Davis & Company, PC

("Davis").  In support hereof, the Debtor respectfully shows the Court as follows.

# I. PREFACE

1. The Committee professionals in this case have failed to meet their burden of proving material benefits exceeding costs to the estate, whether failing to show a benefit to their unsecured creditor class or otherwise failing to show a benefit to the estate as a whole. The Committee Applications, accordingly, should be substantially reduced.

2. Not only do the Committee Applications fail to establish material benefit to any constituent body in this estate, but the Committee Applications also seek to gouge this estate for over $551,000 in fees for the ostensible purpose of representing "non-insider unsecured debt total[ing] $875,000."[1]  $551,175.89 in fees would equate to a sixty-three percent (63%) contingency fee *even if* the Committee professionals had obtained one-hundred percent (100%) present value recovery for their constituents, which they did not. Pie Chart I below shows how the Committee's professionals have devoured the plates of the few creditors sitting at their table.

**Pie Chart I**



---

[1] See Nelson Committee Application [Docket No. 624] at ¶ 10. While the overall liabilities of the Debtor were significantly higher – approximately $55 million – the bulk of the liabilities were secured, priority, or from substantial claims of insider Reichmann or the IRS. Thus, the Committee correctly approximates the non-insider unsecured debt at $875,000.

3.     Put simply, *the creditors in this case would have been better off without the efforts and fees of the Committee*.

4.     Seemingly, the Committee professionals seek to avoid a showing of material benefit by citing the 2007 ABI Study in establishing Committee fees as a percentage of a debtor's professional fees; however, the law allows payment not of a percentage of debtor's counsel fees, but, rather, demands strict proof of material benefit based on a hindsight analysis. This test has not been met by the Committee Applications. Accordingly, the law of this Circuit, as well as reasonableness and practical sense as shown below, demand a substantial discount from the Committee Applications.

## II. OBJECTIONS ON LACK OF MATERIAL BENEFIT AND REASONABLENESS

5.     The Standard:  When requesting professional fees and expenses (and perhaps more so when the fees exceed 60% of the relevant creditor class) the Committee Applications must establish that the requested fees and expenses "actually resulted in a material benefit to the estate." *Andrews & Kurth LLP v. Family Snacks, Inc. (In re Pro-Snax Distributors., Inc.)*, 157 F.3d 414, 425 (5th Cir. 1998).  The material benefit rule requires a review "in hindsight" of work done by counsel to determine if it has been beneficial, and this showing must be met by *all* estate professionals, including the Committee's professionals.  *See, e.g., In re Teraforce Technology Corp.*, 347 B.R. 838 (Bankr. N.D. Tex. 2006) (holding committee counsel to the same standard as other estate professionals); see also *Kaye v. Hughes & Luce, LLP (In re Gadzooks)*, 2007 WL 2059724 (N.D. Tex., July 13, 2007) (same).  The Committee Applications fail to meet this standard.

6.     The Big Picture:  Aside from the substantial claims of the IRS and Reichmann, (each of whom independently was represented by their own counsel against the Debtor), the

entire universe of non-tax unsecured claims actually represented by the Committee is estimated to be approximately $875,000. See Nelson Committee Application [Docket No. 624] at ¶ 10.

7. The estate cannot allow sixty-three percent (63%) of that total to be eaten by the Committee's professional fees. Indeed, the pinnacle of audaciousness of this Committee in charging a 63% fee is prominently displayed by the Committee's comment that "The Committee had to remind the Debtor that its fiduciary duty was to its creditors."[2] As seen in Bar Graph I below, while the Committee represented 1.59% of all claims, it seeks nearly 20% of all fees.

**Bar Graph I – Percentage of Fees Compared Respective Constituents**



8. In the recently filed fee applications and responses to objections [Docket Nos. 588, 640, and 641], the Debtor and its counsel have outlined the benefits they brought to this case; let us now examine the Committee's and its professionals' benefit, if any.

9. <u>Payments to Unsecured Creditors</u>: **The Debtor's unsecured creditors are not better off due to the Committee's efforts**. The Debtor's creditors would be better off receiving

---

[2] See Committee Objection, Docket No. 623, at ¶ 21.

the treatment afforded them under the Debtor's initial April 2007 plan along with the half million dollars instead requested to be paid to the Committee's professionals. The Debtor already has paid Committee professionals nearly $350,000 to date, and the Committee requests another $200,000 in the Committee Applications. *Without the Committee*, the Debtor's unsecured creditors would have been paid over $1 million within four (4) years. The present value of the Debtor's offer, thus, was between $909,183.81 and $949,139.62 (even without *any* litigation recoveries, which provide additional payments in the April plan, versus just earlier payments in the October plan).[3] *After the Committee's efforts* and $551,000+ in fees, the Debtor's unsecured creditors will be paid approximately $1.6 million within seven (7) years. The present value of this result is between $847,399.34 and $978,238.52 (or potentially $61,784.46 or more worse than the payout for creditors without the Committee). The attached present-value analysis at Exhibit A clearly confirms the Debtor's unsecured creditors are not better off due to the Committee, and certainly are not $551,175.89 better off.

10.     The Pulse of the Unsecured Creditors:  The Debtor's unsecured creditors voted overwhelmingly in favor of the Debtor's plan, *both before* the Committee asked them to reject the plan, *and after* the Committee asked them to reject the plan. After the Debtor initially solicited votes on its plan in July 2008, the Committee sent a letter to all unsecured creditors urging them to vote against the plan. The unsecured votes received both before and after the date of that letter were overwhelmingly in favor of the Debtor's plan.[4] The Debtor submits that this

---

[3] The PV Range reflects a discounted rate of 15% and 10%, respectively. The Debtor's initial proposed plan on April 4, 2008 [Docket No. 398] paid unsecured creditors $500,000 payable in five (5) equal annual Cash payments of $100,000 beginning on July 1, 2008, in addition to fifty percent (50%) of net recoveries from estate actions. See April 4, 2008 Plan [Docket No. 398] at p.6, ¶ 4.4. The April 4, 2008 plan allocated funds for payment of Committee fees that, without the Committee, would be available for creditors. After extensive negotiations with the Committee and $551,000 in committee fees, the final plan calls for quarterly payments starting April 16, 2009 through October 16, 2015 and totaling $1,623,505.

[4] The pattern of voting strongly suggests that the Committee existed only for the benefit of generating fees for the Committee's professionals or that the Committee existed only for the benefit of the Committee's chairman and

empirical evidence shows the creditors were unsupportive of further fees, litigation, negotiation, and continuances by the Committee.[5]

11.    <u>Conclusion on Lack of Material Benefit</u>:  Because the Committee professionals have failed to establish material benefits to this estate in the amounts of fees and expenses requested, the Committee Applications collectively **should be reduced to $262,500** (or thirty percent (30%) of the non-insider claims represented by the Committee).

12.    <u>Reasonableness of Fees</u>:  In addition to the lack of material benefit, as shown by Pie Charts II and III below, the amounts requested in the Committee Applications are not reasonable in relation to the claims represented.  *See In re Teraforce Technology Corp.*, 347 B.R. 838, 845-46 (Bankr. N.D. Tex. 2006) (citation omitted) (notwithstanding prior findings of material benefit to the estate, stressing the relevance of "reasonableness" when requesting fees under section 330, and reducing committee counsel's fees from the "grand total of fees and expenses sought [of] $415,583.23" to $280,736.98).

13.    The Debtor submits that a reduction to $262,500 is in line with the "reasonableness compensation" requirement of section 330.  The following two Pie Charts compare the sliver of unsecured creditors with the chunk of Committee fees.

---

largest creditor, James Proctor.  James Proctor asserts a general unsecured claim in the estimated amount of $400,000 asserting damages allegedly sustained while working one of TWD's drilling rigs.  Mr. Proctor was represented by contingency-fee personal injury counsel in this case and did not retain bankruptcy counsel until September, 2008 (more than fifteen months after the commencement of this case).  Besides the general lack of benefit from the representation by the Committee's professionals, the aggregate fees generated by the Committee's professionals would have substantially satisfied the face amount of Mr. Proctor's claim, which math begs the question of whether anyone involved with Mr. Proctor or the Committee ever explained this situation to Mr. Proctor. (Notwithstanding the foregoing, TWD disputes that Mr. Proctor is entitled to the damages sought in his claim.  The parties are scheduled to arbitrate the claim later this year.)

[5] Indeed, unlike the estate's other creditors, the Committee's own chairman, Mr. Proctor, sent in late rejection ballots in an attempt to further thwart the reorganization effort, thereby raising a question over the Committee's motives in this case and the parties for whose benefit the Committee existed.

**Pie Charts II and III – Committee Constituents versus Committee Fees**





## III. ADDITIONAL SPECIFIC POINTS OF OBJECTION

14.     The following specific issues should not be read as a "double objection" to the reasonable amount discussed above, but rather are additional and/or alternative reasons the amounts of the Committee Applications should be significantly reduced.   In other words, notwithstanding the following specific issues, $262,500 would be a reasonable amount for the aggregate totals within the Committee Applications.   The following time-entry examples also should not be read to be comprehensive or to the exclusion of other entries, but are provided as examples of problematic requests within the Committee Applications.

**A. The Committee Applications are unclear on how much is requested.**

15.     Due to inconsistent figures in the Committee's Applications and pleadings, it is difficult to discern exactly how much the Committee's professionals actually are seeking.

16.     For example, in the Committee's objection to fees of Debtor's counsel [Docket No. 623], the Committee aggregates the total of Committee professional fees as $551,175.89. Docket No. 623 at ¶ 27.   However, this total is based on Poyner at $127,172.33, which differs from Poyner's second fee application [Docket No.414 indicating payment of $122,688.26 and Poyner's motion for final approval [Docket No. 620] requesting additional payment of

$10,601.86 (for an apparent requested total of $133,290.12, not $127,172.33). There are other perceived inconsistencies as well, perhaps some related to write-downs upon interim approval.

17. Debtor's counsel has requested clarification from Committee counsel on the amounts requested, including by email on January 30, 2009 and, since, over the phone, and anticipates an update prior to the hearing. Notwithstanding, the Debtor does not believe the Committee professionals can establish material benefit to this estate for $551,175.89, and the Debtor objects to any additional amounts if this total proves incorrect.

**B. The Committee Applications seek too much for mere retention and payment.**

18. The Committee's professionals seek payment in excess of $80,000 in fees aimed solely at retention and compensation matters. The amounts charged by the Committee's various professionals regarding retention and compensation are as follows:[6]

| Professional | Charge to Estate | Note |
|---|---|---|
| Poyner Spruill | $30,725.50 for 117.6 hours | ($13,797.00 for 54.9 hours during first interim period; $16,928.50 for 62.7 hours during second interim period.) |
| Nelson Mullins | $29,680 for 132.8 hours | |
| Harris Finley | between $19,883.00 and $60,843.50, possibly more | ($19,883.00 for 64.2 hours during first interim period under "Employment of Committee Professionals (0002)", though also some additional time under "Administrative (0001)"; $40,960.50 for 173.8 hours during second interim period for several matters grouped under "Administrative 001,002.") |
| Don Davis | $825.00 | |
| Totals | $80,000+ (minimum requested) | The true amount requested by the Committee's professionals could exceed even $115,000 according to the vague time entry narratives and inconsistent and confusing task code applications applied to time entries throughout the Committee Applications |

19. Indeed, the task categories for retention and compensation issues constitute (a) more than a quarter of the entire effort by Poyner and nearly the highest fee category for

---

[6] The following amounts are merely estimates from the Committee Applications; however, Debtor notes the inconsistent use of task categories in the Committee Applications which make these estimates minimum estimates.

Poyner, and (b) similarly, more than a quarter of the effort by Nelson and the second highest fee category, by far, for Nelson.

20.     Moreover, aside from the general category of "Case Administration," retention and compensation is the next highest fee category of all categories of work by counsel for the Committee, as clearly denoted in Bar Graph II below.

**Bar Graph II – Two Highest Committee Fee Categories**



21.     Consequently, the case administration and employment and compensation related fees are excessive and provide no benefit to the estate in such amounts.

22.     **Requested reduction:  $40,000 collectively from all Committee Applications.**

**C. $110,000+ of case administration is too high.**

23.     While the NDTX Guidelines[7] allow for miscellaneous items to be included in a category such as "Case Administration," the professional still must use "reasonable discretion" and the application must provide "meaningful guidance to the Court as to the complexity and difficulty of the task, the professional's efficiency, and the results achieved."  *See* NDTX Guidelines at Section I.C.  Indeed, as illustrated in Bar Graph II above, the Committee's "Case Administration" is the highest category in the Committee Applications and exceeds even the entire case administration of Debtor's counsel.  Because the Davis Committee Application seeks over $57,000 without task categories, the Committee's vague case administration could be even higher.

24.     Moreover, as pointed out in the UST's objection to the Debtor's fee applications, administrative tasks are noncompensable.  The UST appears to have left review of the Committee Applications to the Debtor, and, thus, the Debtor takes the laboring oar of objecting to any noncompensable administrative tasks in the Committee Applications, including, without limitation, the following examples.

| Date | Professional | Narrative | Hours | Fees |
|------|-------------|-----------|-------|------|
| 4/28/08 | U. Steward | Review docket; download pleadings regarding Plan, fee applications and motions and update file/pleading notebook. | 4.0 | $600 |
| 4/29/08 | U. Steward | Review docket; download pleadings regarding Plan, fee applications and motions and update file/pleading notebook. | 3.5 | $525 |
| 5/02/08 | U. Steward | Review docket and update pleadings file. | 1.5 | $225 |
| 6/10/08 | U. Steward | Review docket, download pleadings and update file. | .2 | $30 |
| 6/18/08 | U. Steward | Review docket and update binders and pleadings on file. | .5 | $75 |
| 6/20/08 | U. Steward | Review docket and update file. | .52 | $78 |

---

[7] See U.S. Bankruptcy Court, Northern District of Texas, Guidelines for Compensation and Expense Reimbursement of Professionals, effective January 1, 2001, (the "NDTX Guidelines"), at II.E-F, *available at* http://www.txnb.uscourts.gov/general_orders/2000_7.pdf.

| | | | | |
|---|---|---|---|---|
| 6/23/08 | U. Steward | Review docket; <u>download pleadings</u> and update file and binders. | .6 | $90 |
| 6/24/08 | U. Steward | Review docket and <u>update pleadings</u> binder and file. | .2 | $30 |
| 6/25/08 | U. Steward | Review docket, <u>download filed pleadings</u> and update binders and file. | 2.0 | $300 |
| 6/26/08 | U. Steward | Review docket, <u>download filed pleadings</u> and update binders and file. | 4.0 | $600 |
| 6/19/08 | U. Steward | Review docket and <u>update file</u> and case binders. | .5 | $75 |
| | | **Totals** | **17.52** | **$2,628.00** |

25.     **Requested reduction for $110k+ fees for case administration:  $30,000 collectively from all Committee Applications.**

**D. <u>The Blended Rates of the Committee professionals are too high.</u>**

26.     The issues handled by the Committee's professionals were less complex than those handled by the Debtor's professionals; however, the blended rates in the Committee Applications do not reflect this.  In both the cases of the law firms and the accountants, the Debtor's blended rates are substantially lower than the Committee's:

| Professional | Debtor blended rate | Committee blended rate | Committee surcharge |
|---|---|---|---|
| Legal Counsel | The Curtis Law Firm, PC - $244.54 | 1.  Poyner Spruill LLP - $291-295<br>2.  Nelson Mullins Riley & Scarborough LLP - $287.97<br>3.  Harris, Finley & Bogle, PC - $247.80-$257.45 | ~$31.00 per hour surcharge (based on hours per firm) |
| Accountant(s) | 1.  XIT Solution, LLC - $109.29<br>2.  Walter Thomas - $125.00 | Don Davis and Harris Davis & Company, PC - $203.73 | ~$94.00 per hour surcharge (based on hours per firm) |

27.     The work done by the Committee professionals does not justify the higher blended rates charged, and the requested fees should be reduced.

28.     **Requested reduction:   $54,095 collectively from all Counsel Committee Applications; $26,320 from Davis Committee Application.**

E. **Work not benefiting the estate should not be charged to the estate.**

   i. *Charges for substitution of 2nd Committee counsel with 3rd Committee counsel*

29.     After fighting very hard to retain Poyner & Spruill, LLP because of its "extensive experience and knowledge in the field of debtor's and creditor's rights and business reorganization under chapter 11 of the Bankruptcy code," on March 18, 2008, the Committee filed its Motion to Substitute Attorney Poyner & Spruill, LLP with Nelson Mullins [Docket No. 384].

30.     The estate should not be further taxed with time incurred replacing the Committee's second law firm with a third law firm. *See, e.g.,* HFB Application at p.8 (charging the estate concerning the "substitution of lead counsel's law firm" for the Committee).

31.     Furthermore, the estate should not be taxed with any paralegal time incurred in developing a third set of files at Nelson. Significant administrative time is charged by Nelson for tasks that duplicate efforts that were performed at Poyner.  For example, and without limitation, a June, 24, 2008 entry charges $600 for downloading proofs of claims.[8]  Even if Poyner did not supply the claim .pdf files for this case to Nelson, the same claims obviously were available from Debtor's counsel but no inquiry as to a (free) file transfer was ever made.

32.     **Requested reduction:   $2,000-$3,000 collectively from Nelson and HFB Committee Applications.**

---

[8] Due to another entry of $450 by the same professional on the same day regarding review of the same claims, it is unlikely any non-administrative work was done in connection with the $600 charge.

*ii. Charges for a website not shared with Debtor or Court*

33.     Poyner seeks fees for establishing a website for creditors that has not been proved up or maintained throughout the case.  Without seeing this website, including the detail and accuracy of this website, the Debtor and other parties in interest cannot discern whether the website may have added any value.

**34.     Requested reduction: $1,787.50 from Poyner Committee Application.**

*iii. Charges for attention to esoteric pleadings in Reichmann not affecting TWD's estate*

35.     The Committee professionals have charged the estate for attention to various pleadings and issues in Reichmann that the Committee did not utilize to benefit TWD's estate. Examples include fees for reviewing (a) Reichmann's motion to extend time to reject Reichmann's office lease, (b) Reichmann's Dahlberg adversary, (c) Frost lease issues, (d) Pioneer's administrative payment order, (e) Peters Ranch lease issues, and (f) Bamco, Condor, and Comptroller motions and objections.  *See, e.g.,* HFB Invoice dated September 27, 2007; *and* Davis Invoice for March 2008 ("Review Reichmann Petroleum Corporation documents, 10.3 hours").  Without more, it is unclear how any of this time benefited TWD's estate.

36.     While the Committee professionals still must establish the benefit to TWD's estate from the Committee's monitoring of Reichmann's bankruptcy, these especially esoteric issues in Reichmann's case do not appear to have any plausible benefit to this estate.

**37.     Requested reductions:   $1,000-$2,000 from HFB Committee Application; $2,575 from Davis Committee Application.**

*iv. Charges for opposing disqualification of Lake & Gardenier*

38.     The Committee Applications request compensation for seeking to prevent removal of Lake & Gardenier, the Debtor's prepetition auditors/accountants,  from the

Committee. As explained by the Court-appointed professional Mr. Dan Lain, Lake & Gardenier was in violation of their duties of confidentiality, as promulgated by the AICPA, to their client TWD in attempting to remain on the Committee and utilize and disseminate TWD's own privileged and confidential financial data against it.

39.     The Debtor, through its counsel, attempted to have Lake & Gardenier step down without resorting to litigation; however, the Committee's professionals refused to recognize the Debtor's well-established confidentiality rights and privileges, and refused to remove (or support the Debtor's effort to remove) Lake & Gardenier. The Debtor, thus, was compelled to file a motion seeking their disqualification. The Committee's attorneys then actively coordinated the defense of Lake & Gardenier's committee seat with Lake & Gardenier's own counsel.[9] After hearing on the Debtor's motion and report to the Court by Mr. Lain, Lake & Gardenier subsequently stepped down from the Committee. The Committee's professionals should not be compensated from the estate for seeking to prevent this proper result. *See also,* HFB Invoice dated September 27, 2007 (seeking over $6,000 in fees for preparation for and attending hearings on disqualification of committee member).

40.     **Requested reduction: at least $10,000 from all Committee Applications.**

*v. Charges for unnecessary duplication*

41.     The Committee's multiple law firms led to multiple inter-law-firm conferences that caused duplication of fees for the estate and should be reduced.

42.     By way of example, HFB's first invoice, dated August 29, 2007, starts as follows:

---

[9] *See, e.g.,* Poyner time entries for July 5 and July 9, 2007 regarding preparation and coordination with Lake and Gardenier's lawyer for the July 10, 2007 hearing and July 10, 2007 time entry concerning preparation of examination and arguments in favor of Lake & Gardenier's participation on the Committee. These time entries are in addition to multiple hours spent by Poyner to prepare the briefing requested by the Court on the Lake & Gardenier issue, which is certainly not to call into question at all the Court's request for briefing but to raise the legitimate issue of whether Poyner and/or the other members of the Committee should have had the good sense to defer or delegate the briefing to Lake & Gardenier's own counsel (which briefing *possibly* would have been compensable as an expense incurred by a Committee member had Lake & Gardenier prevailed).

| Timekeeper | Date | Amount | Narrative |
|---|---|---|---|
| BEH | 6/18/7 | $292.50 | … telephone conference with assistant to committee counsel … |
| TDP | 6/19/7 | $525.00 | Meeting with Terri Gardner … |
| BEH | 6/19/7 | $450.00 | … meet with Terri Gardner … |
| TDP | 6/20/7 | $1,050.00 | Meeting with Terri Gardner … |
| BEH | 6/20/7 | $855.00 | … office conference with Terri Gardner … |

43.    In fact, a full 65% of HFB's time entries in the month of June 2007 consist of meetings and conferences between counsel of Poyner and HFB.  These meetings generally included two to three partners from the two firms.  While not prohibited, this is frowned upon by the NDTX Guidelines.  The Debtor put the Committee professionals on notice of this issue early on in the case, and these excessive and continual meetings and conferences among partners should have been better mitigated by the Committee professionals.

44.    While internal meetings and conferences are sometimes unavoidable when dealing with complex case issues, the issues referenced in the Committee conferences were not overly complex, and the estate should be given a discount in this case.

45.    **Requested reduction:  $5,000 collectively from all Committee Applications.**

F.  **The Committee's courtship with Reichmann Petroleum Corp.**

46.    The Committee's Applications describe an unnecessary courtship of Reichmann Petroleum Corp. ("Reichmann") and its counsel to entertain a Reichmann competing plan and the efforts of Reichmann's interim management and professionals to find an "investor" for, or buyer of, the Debtor.  As the Court is well aware, Reichmann was the Debtor's chief adversary, and the Committee's and Reichmann's efforts provided at minimum a distraction to the Debtor and at most impeded and delayed a final resolution of all of the Debtor's issues with Reichmann by indicating weakness and a lack of resolve on the Debtor's side of the table.

47.     As an extension of the Committee's folly of expending resources engaging Reichmann in a competing plan scenario, the Committee also entertained and supported the inquires made by a potential investor described as a client of Art Stewart in Nelson's invoices as otherwise known as Pilgrim's Petroleum.  The difficulty in paying any fees to the Committee for this and similar endeavors arises from the fact that Pilgrim's Petroleum never produced a shred of information that it had the financial wherewithal to enter into any transaction with the Debtor following repeated requests by the Debtor of Pilgrim's for such information.  The Debtor shared the requests made of Pilgrim's and the lack of any response with the Committee, and the Committee's sustained eagerness to entertain Pilgrim's efforts only served to prolong the "investor" distraction longer than was necessary.

48.     **Requested reduction:     $5,000-$6,000 collectively from all Committee Applications.**

G. **Work on a Committee plan, after the real plan was concluded.**

49.     A series of time entries appear in Nelson's September, 2008 invoices regarding further work on a competing Committee plan and discussions with potential management figures and supposed future shareholders.[10]  These time entries were of no value to the estate as the Committee had concluded negotiations with the Debtor on the treatment of the Committee's constituency under the Plan, and the changes to the plan under discussion in September, 2008

---

[10] The Committee's inquiry of Tatum Partners on September 15, 2008 with respect to a potential CEO role for the Debtor under the Committee's competing plan scenario is a tremendous irony considering the Committee's fee objections and the Committee's criticism in this case from time to time of the role played, and fees/salary received by XIT Solution, LLC and Mr. Charlie Lawrence.  Tatum Partners, as referenced in the Nelson Committee Application, refers either to "Tatum Texas [which] operates with more than 200 partners and professionals in three markets" or to Tatum LLC which has "1,000 partners and principals in 37 officers around the country" and which group in any event sounds far more expensive than XIT Solution, LLC and its rate of $125 per hour or the $130,000 annual salary paid for Mr. Charlie Lawrence and his four decades of experience in the oil and gas industry.  *See* www.tatumllc.com/about and www.tatumllc.com/office-locations/texas.asp.

were dictated largely by positions taken by the IRS in response to the treatment proposed by the Debtor for the general unsecured creditors.

| | | | |
|---|---|---|---|
| 09/15/08 | Talked to Tatum Partners regarding possible CEO role; called Fort Worth attorney to discuss CEO prospects for possible committee Plan. | | |
| | T.L. GARDNER | 0.50 hrs. | $175.00 |
| 09/15/08 | Worked on Committee Plan of Reorganization at request of Committee. | | |
| | T.L. GARDNER | 2.50 hrs. | $875.00 |
| 09/16/08 | Talked to Gus Dixon/George Cauthen regarding issues in preparing Committee Plan and stockholder issues. | | |
| | T.L. GARDNER | 0.70 hrs. | $245.00 |
| 09/17/08 | Talked to representatives of Tatum Partners regarding possible Committee Plan and assistance in effort. | | |
| | T.L. GARDNER | 0.50 hrs. | $175.00 |

50.     The dynamics of the Debtor's feasibility or whether the Debtor's plan would pay the most amount possible to general unsecured creditors was even less of an issue in September, 2008 than at any other point in the case where the Committee sought to bill the estate for preparations of a competing plan.

## H. The Committee's Accountant seeks compensation prior to authorized retention.

51.     The application seeking the employment by the Committee of Mr. Don Davis and Harris, Davis & Company, PC was filed on October 11, 2007 [Docket No. 312]. The Order authorizing the employment of the Committee's accountant was entered November 7, 2007 [Docket No. 291]. Neither the application nor the order on employment sought or approved employment *nunc pro tunc*. However, the Davis Committee Application seeks compensation for several months prior to entry of the order on employment, and several months even prior to the application for employment. Because the Committee was not authorized to retain its accountant in July 2007, the estate should not be charged for pre-engagement services (at least until the application was filed on October 11, 2007). *See, e.g., Lamie v. U.S. Trustee*, 124 S.Ct. 1023 (2004) (section 330 compensation requires employment under section 327).

52.     **Requested reduction:  $5,692 from Davis Committee Application.**

**I. The Committee seeks substantial compensation over a month after its dissolution.**

53.     Pursuant to paragraph 12.21 of the Debtor's confirmed plan [Docket No. 577], "The Committee shall cease to function on the Effective Date of the Plan."  Although counsel for both the Debtor and the Committee have discussed the Committee's ability to seek and object to fees, the Committee Applications seek at least $17,645.56 in fees and expenses for nearly eighty (80) hours of work from the day after dissolution of the Committee through January 26, 2009.[11]

54.     The Debtor believes this request takes improper advantage of the estate when the Committee's second highest fee category already consists of retention and compensation.

55.     **Requested reduction:     $10,000 from Nelson and HFB Committee Applications.**

**J. The Committee Applications do not comply with the NDTX Fee Guidelines.**

56.     The NDTX Guidelines apply to all chapter 11 professionals, yet the Committee Applications do not comply with those guidelines.

  i. *Task Categories*

57.     Among other things, the NDTX Guidelines require professionals seeking more than $10,000 in fees to organize narratives in categories by subject matter.  See NDTX Guidelines at Section I.C.  This was not done by the Committee's accountants.  The NDTX Guidelines also indicate that "in larger cases with multiple professionals, efforts should be made by the professionals for standard categorization."  While Poyner and Nelson made an effort to comply with each other's task codes, the other Committee professionals did not make an effort to conform to Poyner and Nelson's task codes, nor did the Committee as a whole make an effort to

---

[11] Nelson seeks fees of $10,365.00 and expenses of $66.40; HFB seeks fees of $7,132.50 and expenses of $81.66.

devise uniform task codes. The lack of coordination of task codes, or providing any task codes at all, makes it difficult for interested parties to review the tasks and benefits achieved by the Committee professionals. This is in stark contrast to the uniform task codes used by the Debtor's three professionals' in their fee applications.

58.     The Nelson invoices, however, contain several examples of the awkward treatment of task codes in the Committee Applications. In the Nelson invoices, the same timekeepers mix and mingle entries, many occurring on the same day, between the related but separate categories, which has the effect, without expending time in study and analysis, of impeding an efficient recognition of time spent per day on the same or related tasks.[12] Projects that encompass several days appear under multiple task code groupings. For example, a memorandum from Nelson to the members of the Committee that was "[p]repared" on July 2, 2008 under task code "B220 Reorganization/Monitoring and Strategy" was "[r]evised and updated" on July 3, 2008 under the "B200 Committee Issues" task code.[13]

59.     The Debtor also has a difficult time understanding the task codes assigned by HFB which uses a unique set of task codes that often are given different names/matters. *Compare, e.g.,* HFB Interim Fee Application [Docket No. 327] at p.7 (assigning Task Code 0002 to "Employment of Committee Professionals") *with* (a) HFB Invoices [Docket No. 327, Exhibit A] (assigning Task Code 0002 to "Examiner (Texas Wyoming Drilling)" or "Examiner (Texas Wyoming Drlg)") *and* (b) HFB Final Fee Application [Docket No. 625] at p. 8 (assigning Task Code 0002 to "Administrative 001, 002").

60.     **Requested reduction:   at least $5,000 collectively from all Committee Applications.**

---

[12] The Nelson Exhibit A-2 containing a straight chronological listing of all time entries was provided for the first time with the Nelson final Committee Application.
[13] *See* Nelson application, Ex. A-1, at p. 37.

*ii. Professional Billing Summaries*

61.     The Committee Applications also fail to comply with NDTX Guidelines requiring billing summaries for each professional providing services.  See NDTX Guidelines at Section I.D.  The Committee Applications (other than Poyner's) failed to provide this information.  Again, this makes it difficult to accurately assess whether the fees requested are reasonable and compensable by professional.  *Compare, e.g.,* Exhibit B attached to The Curtis Law Firm, PC's Fee Application.

62.     **Requested reduction:  $5,000 collectively from all non-Poyner Committee Applications.**

*iii. Contemporaneous Time Records*

63.     "All professionals, except auctioneers, real estate brokers, and appraisers must keep accurate contemporaneous time records."   NDTX Guidelines at Section II.A.   The Committee's accountants do not appear to have done this.  All of Mr. Davis's invoices from July 2007 through October 2008 are dated December 31, 2008.  The issue is not veracity, but rather accuracy, completeness, and timely disclosure.  Without further explanation for invoices dated more than a full year after the work was performed, the contemporaneousness and accuracy of these invoices is uncertain.

64.     **Requested action:  Clarification on record keeping.**

*iv. Charges for Word Processing*

65.     The Committee Applications include charges for Word Processing.  For example, the following charges for word processing are found in the Nelson invoices.

| | |
|---|---|
| March 2008 | $71.75 |
| May, 2008 | $67.50 |
| September, 2008 | $639.60 |
| January, 2009 | $54.00 |
| **Totals** | **$ 832.85** |

66.     Of course, word processing is not reimburseable pursuant to the NDTX Guidelines at Section III.E.

67.     **Requested Action:   Elimination of all word processing charges in the Committee Applications, in the minimum amount of $832.85.**

*v. Travel agreements and NDTX Guidelines not adhered to*

68.     The Nelson Committee Application appears to charge the estate for expenses in excess of the $700 per-trip agreement with the Debtor.  *Compare* Nelson Committee Application at p.4, ¶ 5 ("Furthermore, P&S entered a letter agreement with the Debtor wherein P&S agreed, among other things, that it would not bill for travel time nor charge expenses in excess of $700 per trip to Texas.  NMRS has abided by the fee and billing protocol established for P&S."), *with* Nelson Committee Application, Invoice dated July 24, 2008 at p. 15 (expensing $920.78 for travel on May 2, 2008, and $956.75 for travel on June 4, 2008).  While the Debtor can make exception for one expense, it cannot for two or more.

69.     As to fees, at least one entry in the Nelson invoice charges a full hourly rate for travel instead of one-half of the hourly rate, as required under the NDTX Guidelines.  *See* NDTX Guidelines at Section II.G.

| 10/02/08 | Travel from Irving, Texas hotel to Fort Worth. | | |
|---|---|---|---|
| | T.L. GARDNER | 0.70 hrs. | $245.00 |

70.     **Requested Action:   Reduction of (a) expenses in excess of agreed rates and (b) full-rate travel charges in the Committee Applications.**

*vi. Failure to use associate-level personnel for research.*

71.    The Nelson invoices charge a partner rate, in at least one instance, for research that could have been (and should have been) conducted by a lower-priced attorney. The Nelson invoices contain the following example.

| 10/26/08 | Research of 1129(a)(3) provisions and cases dealing with bad faith and Court's equitable powers as applied to 1129(a)(3). | | |
| | T.L. GARDNER | 2.00 hrs. | $700.00 |
| 10/26/08 | Drafted Objection to Confirmation of Amended Plan of Reorganization. | | |

72.    **Requested Action:  Reduction of partner research time to associate rates.**

## SUMMARY

When examined as a whole, the actions that generated the fees requested in the Committee Applications did not result in a material benefit to this estate, and the costs of the Committee Applications to the estate far surpass any benefit that the estate derived from those actions. Yet, the Committee asks for sixty-three percent (63%) of the same estate they were charged to preserve, even though none of the accumulated fees enhanced the value of, or in any way benefitted, this estate.  To resolve this disconnect, the law in the Fifth Circuit requires, and practical sense demands, a substantial reduction to the Committee's professional fees.

WHEREFORE, the Debtor respectfully requests that the Court approve no more than $262,500 in total fees and expenses for the Committee's legal professionals and determine that any fees and expenses charged in excess of such amount may not be awarded, are not reasonable, necessary, or beneficial to the Debtor's estate or creditors.  The Debtor also seeks all other relief as is just and appropriate.

Dated:  February 20, 2009                    Respectfully submitted,


                                             */s/ Mark A. Castillo*
                                             Stephanie D. Curtis
                                                Texas State Bar No. 05286800
                                             Mark A. Castillo
                                                Texas State Bar No. 24027795
                                             Jeff Carruth
                                                Texas State Bar No. 24001846
                                             THE CURTIS LAW FIRM, PC
                                             901 Main Street, Suite 6515
                                             Dallas, Texas 75202
                                             Telephone: 214.752.2222
                                             Facsimile: 214.752.0709

                                             *COUNSEL FOR THE REORGANIZED DEBTOR*


                       **CERTIFICATE OF SERVICE**

        This is to certify that, on February 20, 2009, a true and correct copy of the foregoing
document has been served on the Committee and its professionals by the Court's ECF service,
and by fax or first-class mail, postage prepaid, and also upon all other parties receiving ECF
notification.


                                             */s/ Melanie P. Goolsby*
                                             Melanie P. Goolsby