U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed February 04, 2013**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 7 |
| TEXAS WYOMING DRILLING, INC. | § | |
| DEBTOR. | § | CASE NO. 07-41650-DML7 |
| | § | |

### MEMORANDUM OPINION

Before the court is the *Trustee's Objection to Claim No. 82 (Charlie Lawrence)* (the "Objection," docket no. 961[1])[2] filed in the Case on September 24, 2012 by John Dee Spicer, chapter 7 trustee (the "Trustee") for Texas Wyoming Drilling, Inc. ("Debtor") pursuant to

---

[1] "Docket no. __" will hereinafter refer to the corresponding docket entry in the above-captioned bankruptcy case (the "Case").

[2] The United States, on behalf of the Internal Revenue Service ("IRS"), also filed a notice of support of the Objection on October 15, 2012 at docket no. 968. The IRS is the principal creditor of Debtor (defined below). *See* Docket no. 701.

1

Bankruptcy Code[3] section 704(a)(5)[4] and Federal Rule of Bankruptcy Procedure 3007. By the Objection, the Trustee objects to Claim No. 82 (the "Claim") filed by Charles C. Lawrence ("Lawrence"), the former consulting director, president, and chief operating officer for Debtor. Lawrence claims that the court's conversion of the Case from a case under chapter 11 of the Code to one under chapter 7 constitutes an involuntary termination of his employment agreement with Debtor. As a result, Lawrence seeks a total of $232,750.00 in compensation, benefits, and other expenses to be paid immediately as an administrative expense in the Case. The court held a hearing on the Objection on December 11, 2012 (the "Hearing"),[5] at which the court admitted into evidence documentary exhibits[6] and heard testimony from (1) Lawrence, (2) Nathan Villanueva, a revenue officer advisor for the IRS Advisory Unit ("Villanueva"), and (3) Julie Lawrence, wife of Lawrence and financial controller and a stockholder of Debtor ("Julie").[7] At the conclusion of the Hearing, the court took the matter under advisement.

The court exercises core jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 9014, 7052.

---

[3] 11 U.S.C. §§ 101 *et seq*. (the "Code").

[4] Code section 704(a)(5) reads "The trustee shall . . . if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper."

[5] The transcript of the Hearing, which is available at docket no. 989, will hereinafter be cited as TR (*name of witness*) at __.

[6] The court admitted the Trustee's Exhibits A-F, G1-G3, H-K, L1-L3, M-O, P1-P2, and Q-Z. The court also admitted Lawrence's Exhibits 3-5 and 9-10. *See* docket no. 985. Exhibits shall hereinafter be cited as "Ex. __," where letters signify the Trustee's exhibits and numbers signify Lawrence's exhibits.

[7] The court will refer to Julie by her first name to avoid confusion with Lawrence.

# I. BACKGROUND

*A. Debtor's Chapter 11 Petition*

Prior to its bankruptcy, Debtor's business operations consisted of three primary areas: (1) oil drilling operations, (2) a working ownership in several dozen oil wells, and (3) "snubbing" operations, defined as relieving pressure on oil wellheads to prevent pipes from coming out of the ground. TR (Lawrence) at 5-8.

Debtor filed a voluntary bankruptcy petition under chapter 11 of the Code on April 16, 2007. *See* docket no. 1. Debtor's goal in bankruptcy was to continue its business operations and restructure its debt, particularly debt owed to the IRS. TR (Lawrence) at 6-7; *id*. (Julie) at 73-74. Debtor believed that it could maximize return to creditors by operating the business as a going concern through chapter 11 rather than liquidating its assets through chapter 7. *Id*. (Lawrence) at 8.

On November 12, 2008, Debtor filed *Debtor's First Amended Plan of Reorganization* (the "Plan," at docket no. 577). The court confirmed the Plan on November 13, 2008. *See Order Confirming Debtor's First Amended Plan of Reorganization* (the "Confirmation Order," at docket no. 578). The Plan became effective on December 15, 2008. *Id*. The Plan was to be funded by Debtor's business operations. TR (Lawrence) at 5-6. Neither the Plan nor the *First Amended Disclosure Statement Under [Code] § 1125 In Support Of Debtor's Plan of Reorganization* (the "Disclosure Statement," at docket no. 476) contemplated the possibility that the Plan would fail and Debtor would be required to liquidate. TR (Lawrence) at 13.

*B. The Executive Employment Agreement With Lawrence*

Lawrence and Debtor entered into an *Executive Employment Agreement* (the "Agreement," at Ex. D), pursuant to which Lawrence agreed to serve as Debtor's president and chief operating officer from December 15, 2008 until December 15, 2014 (the "Term")[8] in exchange for (1) a base salary of $130,000.00 annually; (2) a bonus "[a]s determined from time to time by the Board of Directors;" and (3) "Twenty-five percent (25.00%) of all of the outstanding shares of the reorganized [Debtor] [issued] pursuant to the" Plan. Agreement, Ex. A.[9] The Agreement also permitted Lawrence to "participate, on the same basis generally as other employees of [Debtor], in all general employee benefit plans and programs," including but not limited to health insurance. Agreement § 2.2. Lawrence and Debtor "enter[ed] into th[e] Agreement pursuant to and in conjunction with the [Plan]." *Id*. at p.1; *see also* Confirmation Order ¶ 33. The Agreement was not, and did not have to be, presented to the court prior to its execution and implementation by Debtor following the effectiveness of the Plan. *See* Confirmation Order ¶ 33.

Under the terms of the Agreement, Lawrence can either be terminated voluntarily, involuntarily, or for cause. *See* Agreement §§ 3.1-3.5. Each type of termination has different preconditions and consequences.[10] *Id*.

---

[8] While the Agreement specifies an effective date, the Agreement does not specify when Lawrence signed it. Lawrence could not recall at the Hearing when he signed the Agreement. TR (Lawrence) at 17.

[9] Here, "Ex. A" refers to Exhibit A of the Agreement, not Trustee's Exhibit A.

[10] As will become apparent in Section III.C.1., *infra*, there is no need to discuss these preconditions and consequences because the court's decision is not based on those terms of the Agreement.

4

*C. Conversion to Chapter 7*

In early 2009, Debtor encountered economic difficulties and failed to make a required payment to the IRS under the Plan. TR (Lawrence) at 10-13; *id.* (Villanueva) at 61-65; *id.* (Julie) at 80-81, 83, 91-93. In light of its business difficulties, Debtor entered into an auction agreement with Kruse Energy & Equipment, LLC ("Kruse") on June 5, 2009, pursuant to which seven drilling rigs that Debtor customarily leased to customers would be auctioned off (the "Auction"). *Id.* (Lawrence) at 14-16; *see also* Ex. G-3. Lawrence, as a member of Debtor's board of directors, was one of several representatives of Debtor who approved Debtor's decision to auction the rigs. TR (Lawrence) at 14-15; *id.* (Julie) at 81. Debtor's debtor-in-possession lender held a security interest in the seven rigs. *Id.* (Lawrence) at 26-27. As Lawrence admitted at the Hearing, the consummation of the Auction, which was set to occur on or around July 16, 2009,[11] would cause "one category of [Debtor's] business operation income," namely "the leasing of drilling rigs," to "go away." *Id.* at 14. Lawrence further admitted that as a result of Debtor losing this stream of income, "[Debtor's] ability to perform under [the Plan]" would be "shot by the auction." *Id.* at 26-29.

According to Lawrence, Debtor was advised by the Curtis Law Firm ("Curtis"), Debtor's chapter 11 counsel, that the IRS had notice of and approved the Auction, and Debtor was therefore permitted by its board to proceed with the Auction. TR (Lawrence) at 32-34. Lawrence later learned that the IRS had not in fact approved the Auction. *Id.* at 33. In actuality, the IRS had no notice of the Auction until a few days before the Auction was set to occur. *Id.* (Villanueva) at 65. Lawrence never personally discussed the Auction with any representative for the IRS. *Id.* (Lawrence) at 40. Lawrence testified that he would not "have signed th[e]

---

[11] *See* TR (Lawrence) at 16.

agreement with Kruse if [Curtis] hadn't told [him] to sign it," and that, as a non-lawyer, he "depended entirely on [Curtis] to advise [him] in what [he] was supposed to be doing in the Chapter 11" stage of the Case. *Id.* at 33-34.

On July 14, 2009, upon learning of Debtor's default under the Plan, the court, pursuant to Code section 1112, converted the Case *sua sponte* from one under chapter 11 of the Code to one under chapter 7 (the "Conversion") because Debtor had "taken steps to auction a substantial portion of its assets" without timely informing either the unsecured creditors' committee or the IRS, and therefore had "materially default[ed]" under the terms of the Plan. *Order Converting Case*, at docket no. 701, 1-2 (the "Conversion Order"); *see also* TR (Lawrence) at 6-7. "[T]he court conclude[d] that the best interests of creditors would be served by conversion of th[e] [C]ase to chapter 7." Conversion Order at 2. Immediately thereafter, the United States trustee appointed the Trustee.

The Auction of Debtor's property was initially canceled because of the Conversion. TR (Lawrence) at 23-24. However, the IRS and the Trustee agreed that, because Debtor would henceforth be liquidated, auctioning off Debtor's assets would be in the best interest of creditors. *See* docket no. 707. Therefore, the Auction was consummated on the originally scheduled date. TR (Lawrence) at 25-26. Lawrence attended the Auction to answer prospective bidders' questions and thereby encourage bidding and maximize the final sale price for the rigs. *Id.* at 42-46, 48; *id.* (Julie) at 77-78. The Auction brought in more revenue than expected. *Id.* (Lawrence) at 26.

As a result of the Conversion, Lawrence no longer works for Debtor. He now makes a living as a drilling consultant who has "worked for . . . five or six different" companies. TR (Julie) at 75-76. However, no member of Debtor's board of directors ever officially informed

6

Lawrence he was terminated under the Agreement; nor did any officer of Debtor, nor the Trustee. *Id*. (Lawrence) at 34-35.

On October 13, 2009, Lawrence filed the Claim. Lawrence claims that he was involuntarily terminated on the date of the Conversion as a result of the Conversion Order. Claim at 2. Therefore, argues Lawrence, he is entitled to an "administrative claim in the amount of $232,750.00" payable "immediately." *Id*. at 1. Lawrence breaks the Claim down as follows:

| | |
|---|---|
| 2009 remaining salary | 65,000 |
| Lump sum distribution | 130,000 |
| Vacation 2009 | 5,000 |
| Health insurance | 19,200 |
| Truck | 6,000 |
| Truck Insurance | 500 |
| Truck maintenance and fuel | 1,800 |
| TOTAL of employment compensation agreement | 227,500 |
| Other time payable to [Lawrence] July 16-17, 2009 – travel to auction in Odessa Tx. 16 hrs. @ $250.00 per hr. | 4,000 |
| Sept. 21, 2009 – Met with Barbara Hargis and [the] Trustee @ 403 Dennis Rd. 3 hrs. @ $250.00 | 750 |
| Oct. 9, 2009 – Met with [Kruse] 2 hrs. @ $250.00 | 500 |
| Grand Total: | $232,750[12] |

The "Other Time Payable to [Lawrence]" category represents time accrued post-Conversion. TR (Lawrence) at 50. Neither the court nor the Trustee formally approved Lawrence accruing this time; these activities were "just things that [Lawrence] felt . . . assisted the estate" for which he "should receive some compensation." *Id*. at 50-51.

---

[12] Claim at 2.

## II. ISSUES

The Objection presents the following questions:

1. Is the Claim valid?

2. If yes, should the court allow the Claim in its entirety, or only in part?

3. If the Claim is valid, what is the status of the Claim? In other words, should the Claim be afforded administrative expense priority, or should it be treated as a general unsecured claim?

## III. DISCUSSION

"Properly filing a proof of claim constitutes *prima facie* evidence of the claim's validity and amount." *E.g.*, *McGee v. O'Connor (In re O'Connor)*, 153 F.3d 258, 260 (5th Cir. 1998) (citing FED. R. BANKR. P. 3001(f)). "If the Trustee objects, it is his burden to present enough evidence to overcome the *prima facie* effect of the claim." *Id*. (citing *Brown v. IRS*, 82 F.3d 801, 805 (8th Cir. 1996)). "If the Trustee succeeds, the creditor must prove the validity of the claim." *Id*. (citing *In re Hemingway Transp.*, 993 F.2d 915, 925 (1st Cir. 1993)).

The Trustee does not allege that the Claim is untimely, incomplete, or otherwise procedurally defective. *See* Objection. Thus, the Claim is *prima facie* valid, and the Trustee therefore has the initial burden to rebut the Claim's validity and amount. If the Trustee can do so, then the burden will shift to Lawrence to prove he is entitled to the Claim.

### A. Lawrence's Post-Conversion Activities

At the outset, the court will disallow the $5,250[13] Lawrence claims for his post-Conversion activities. Following the Conversion, Lawrence was no longer employed by Debtor.

---

[13] $4,000 (Travel to Auction) + $750 (Meeting with the Trustee and other counsel) + $500 (Meeting with Kruse) = $5,250.

TR (Julie) at 75-76. Nor was he authorized by the court, or even by the Trustee, to incur expenses to assist Debtor. *Id*. (Lawrence) at 50-51. Lawrence was therefore not empowered or permitted to perform services for Debtor at an hourly rate of his own choosing on his own initiative. As a result, he may not recover for time spent doing so.

*B. Assumption/Rejection of Agreement*

Having disposed of $5,250 of the Claim, the first question regarding the remainder of the Claim is whether the Agreement is an executory contract within the meaning of the Code, and if so whether Debtor assumed or rejected the Agreement pursuant to Code section 365.

Though the Code does not define the term "executory contract,"[14] an executory contract is usually defined as "[a] contract under which debtor and nondebtor each have unperformed obligations and the debtor, if it ceased further performance, would have no right to the other party's continued performance." BLACK'S LAW DICTIONARY (9th ed. 2009). *Accord* 3 COLLIER ON BANKRUPTCY ¶ 365.02[2][a]. The United States Court of Appeals for the Fifth Circuit has adopted this definition.[15]

Code section 365(a) permits a debtor-in-possession or trustee to "assume or reject any executory contract . . . of the debtor," subject to court approval and certain restrictions. Section 365 may be used to assume or reject employment contracts like the Agreement. *See*, *e.g.*,

---

[14] *See*, *e.g.*, 3 COLLIER ON BANKRUPTCY ¶ 365.02[2][a]; *In re Spectrum Info. Techs., Inc.*, 193 B.R. 400, 404 (Bankr. E.D.N.Y. 1996).

[15] *See*, *e.g.*, *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 742 (5th Cir. 1996); *Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62-63 (5th Cir. 1994).

This definition of "executory contract" is known as the "Countryman Definition," after Professor Vern Countryman, and has been widely accepted. *See*, *e.g.*, *In re WRT Energy Corp.*, 202 B.R. 579, 582-83 (Bankr. W.D. La. 1996) (citing Vern Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 MINN. L. REV. 439, 460 (1973)). *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984) (citations omitted).

*Bachman v. Commercial Fin. Servs., Inc. (In re Commercial Fin. Servs., Inc.)*, 246 F.3d 1291, 1293 (10th Cir. 2001). If the debtor assumes a contract, then "any liability thereafter" on that contract "will be an expense of administration, including liability for a later rejection."[16] By contrast, if the debtor rejects a contract, then that rejection will be treated as a breach of that contract, and "the estate will lose any benefit from the contract and will be liable for damages for the breach."[17]

Code section 365(d)(1) provides that "[i]n a case under chapter 7 of [the Code], if the trustee does not assume or reject an executory contract . . . of the debtor within 60 days[18] after the order for relief . . . then such contract . . . is deemed rejected." Code section 365(d) "appl[ies] in a case," like this one, "that has been converted" from a chapter 11 reorganization to a chapter 7 liquidation "as if the conversion order were the order for relief." Code § 348(c). Thus, in a case that has been converted from chapter 11 to chapter 7, when determining whether or not a contract is executory, the court looks at whether the contract was executory at the time of conversion.[19]

---

[16] 3 COLLIER ON BANKRUPTCY ¶ 365.03[2] (citations omitted).

[17] 3 COLLIER ON BANKRUPTCY ¶¶ 365.03[2], 365.10. *Accord, e.g., In re Pilgrim's Pride Corp.*, 467 B.R. 871, 875 (Bankr. N.D. Tex. 2012) (citing *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996); *Bildisco*, 465 U.S. at 530).

[18] An exception, not relevant here, exists if the court extends the 60-day period for cause. *See* Code § 365(d)(1).

[19] *See, e.g., In re Paul A. Nelson, P.A.*, 203 B.R. 756, 763 (Bankr. M.D. Fla. 1996).

Although some courts hold that "[t]o determine whether a contract may be [assumed or] rejected under [Code section] 365(a), we look to whether the contract was executory *at the time of the filing of the bankruptcy petition*," *Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F.3d 665, 669 n.4 (9th Cir. 2007) (emphasis added); *accord, e.g., In re Ellipsat, Inc.*, 480 B.R. 1, 7 (Bankr. D.D.C. 2012), these cases are distinguishable because they do not involve bankruptcy cases that were converted to chapter 7. Code section 348(c) provides that the effect of conversion is to move the date of the order of relief from the date of the filing to the date of conversion for the purposes of assumption and rejection under Code section 365(d). Thus, Code section 365 is not limited solely to pre-petition contracts.

It is clear that the Agreement was an executory contract at the time of the Conversion; Lawrence had yet to provide personal services to Debtor for the remainder of the Term, and Debtor had yet to pay Lawrence his salary and benefits for the period following the Conversion until the end of the Term. There is no allegation that the Agreement is not a valid contract. Thus, the Agreement falls within the ambit of Code section 365, and the court must therefore determine whether the Agreement was assumed or rejected.

The Agreement is a post-petition contract, and generally post-petition contracts are treated the same as assumed contracts.[20] However, because the Agreement was entered between the Confirmation Order and the Conversion Order, the Agreement is categorically different from other post-petition contracts. First, "[u]pon confirmation of [a chapter 11] plan, the estate cease[s] to exist,"[21] and so at the time Debtor and Lawrence entered the Agreement there was no estate to assume the contract. Secondly, as a general matter, to enter into a post-petition contract, the debtor must either enter the contract in the "ordinary course of business," *see* Code § 363(c)(1), or receive court approval to enter into the contract outside the ordinary course, *see* Code § 363(b)(1). The Agreement was not entered in the ordinary course of business; hiring a new president/chief operating officer is a major business decision taken outside the ordinary course.[22] Nor did Debtor receive court approval to enter into the Agreement; while the Confirmation Order authorizes Debtor to enter the Agreement as a general matter, *see* Confirmation Order ¶ 33, the Court was never called upon to approve the specific terms of the

---

[20] *Devan v. Simon DeBartolo Group, L.P. (In re Merry-Go-Round Enters., Inc.)*, 180 F.3d 149, 156 (4th Cir. 1999) (describing assumed contracts and post-petition contracts as "functionally analogous"). *Accord, e.g., Adamowicz v. Pergament (In re Lamparter Org., Inc.)*, 207 B.R. 48, 51 (E.D.N.Y. 1997).

[21] *Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351 (5th Cir. 2008) (citing Code § 1101(1); *In re Grinstead*, 75 B.R. 2, 3 (Bankr. D. Minn. 1985)).

[22] *Cf. In re Consol. Auto Recyclers*, 123 B.R. 130, 140 (Bankr. D. Me. 1991).

Agreement. Thus, the court cannot treat the Agreement the same as an assumed contract solely because it is a post-petition contract.

Having determined that the Agreement is not entitled to special status solely by virtue of being a post-petition contract, the court concludes that the Agreement was rejected. To reiterate, in a case that has been converted to a chapter 7 liquidation, "if the trustee does not assume or reject an executory contract . . . of the debtor within 60 days after the [order converting the case] . . . then such contract . . . is deemed rejected." Code §§ 365(d)(1), 348(c). The Trustee did not assume the Agreement within the 60-day timeframe provided by Code section 365(d)(1). *See* Objection ¶ 11. Thus, the contract was automatically rejected and thereby breached. Lawrence has clearly been damaged by this breach; because Debtor is being liquidated, Lawrence can no longer serve as Debtor's president and chief operating officer for the remainder of the Term, and Debtor will not pay Lawrence for his services. Therefore, Lawrence has a valid claim against Debtor for breach of the Agreement, and the Claim will consequently be allowed. *See* Code § 502(b). As a result, Lawrence is entitled to monetary damages; the question is how much, and with what priority.

### C. Valuation of Lawrence's Claim

Having already determined that Lawrence is not entitled to damages for the services he unilaterally rendered for Debtor's benefit post-Conversion,[23] the court must decide whether Lawrence is entitled to the remainder of the Claim. The court will first consider Lawrence's salary claim, then the court will consider his claim for fringe benefits.

---

[23] *See supra* Section III.A.

*1. Compensation for Services Rendered*

Although the Agreement enumerates three ways that Lawrence's employment with Debtor can be terminated (termination for cause, involuntary termination, and voluntary termination) and specifies the amount of salary to which Lawrence is entitled in the event of each type of termination, the court is not limited to concluding that Lawrence has been terminated pursuant to one of those three contractual provisions. As this court held in *In re Pilgrim's Pride Corp.*, 467 B.R. 871 (Bankr. N.D. Tex. 2012), the rejection and breach of a contract does not require the court to interpret and effectuate the termination provisions of that contract. *Id*. at 876-79, 882. The debtors in *Pilgrim's Pride* utilized Code section 365[24] to reject contracts that, like the Agreement, had clauses that specified various ways the contracts could be terminated and set forth the consequences of each form of termination. *Id*. at 876-79. The debtors then argued that they could rely on the terms of those clauses to limit the damages owed by the counterparties to those contracts. *Id*. This court disagreed:

> Debtors elected in the instant matter to utilize section 365(a) of the Code to eliminate their future obligations under the . . . contracts. *They thus chose to breach those contracts – rather than looking to the contracts and non-bankruptcy law for relief; now [the d]ebtors must accept the consequences of their breach.*

*Id*. at 882 (emphasis added). The instant case is no different. Lawrence was not terminated involuntarily or for cause by Debtor. *See* TR (Lawrence) at 34-35. Nor did Lawrence voluntarily leave Debtor; he ceased working for Debtor because of the Conversion. *See id*. (Julie) at 75-76. Rather, the event that formally terminated Lawrence's employment with Debtor was the Trustee's failure to assume the Agreement following the Conversion. Thus, the breach

---

[24] Whereas the Trustee here automatically rejected the Agreement under Code section 365(d) by failing to assume the Agreement, *see supra* Section III.B., the *Pilgrim's Pride* debtors sought – and this court granted – authorization to reject the contracts under Code section 365(a). 467 B.R. at 874; *see generally In re Pilgrim's Pride Corp.*, 403 B.R. 413 (Bankr. N.D. Tex. 2009). This distinction does not affect the court's conclusion, because the effect of rejection is the same regardless of whether the contract is rejected under subsection (a) or subsection (d).

13

excused performance on both sides,[25] subject to Debtor paying damages for its breach.[26] As a result, the amount of damages to which Lawrence is entitled is the amount he would receive under the Code in the event of a breach.

Because the Agreement is a rejected employment contract, Code section 502(b)(7) provides that Lawrence can receive no more than

> (A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
>
> > (i) the date of the filing of the petition; or
> >
> > (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
>
> (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates[.]

Code section 502(g)(1) further provides that "[a] claim arising from the rejection" of a contract under Code section 365 "shall be determined, and *shall be allowed* under" Code section 502(b) "*the same as if such claim had arisen before the date of the filing of the petition*" (emphasis added).[27] *See also* Code § 348(d). Insofar as the Claim requests compensation for personal services rendered, it will be allowed up to the cap set by Code section 502(b)(7). In accordance

---

[25] Neither party could have performed under the Agreement following the Conversion, because Debtor was to be liquidated under the Trustee's supervision. Lawrence could not act as president/chief operating officer, and Debtor could not continue its usual operations or pay Lawrence for his services.

[26] Note that although Debtor's rejection of the Agreement terminated Lawrence's *employment*, it did not terminate the *Agreement as a contract*. As numerous courts and commentators have explained, breach of a contract by rejection under Code section 365 does not "terminate" that contract or abrogate the rights that parties would have under that contract outside of bankruptcy. *See, e.g., Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077 (5th Cir. 1994); *In re Palace Quality Servs. Indus., Inc.*, 283 B.R. 868, 888 n.20 (Bankr. E.D. Mich. 2002); *In re Bergt*, 241 B.R. 17, 25 (Bankr. D. Alaska 1999); 3 COLLIER ON BANKRUPTCY ¶ 365.10[3]; 9C AM. JUR. 2D BANKRUPTCY § 2377; *see generally* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. COLO. L. REV. 845 (1988). Rejection may excuse *performance* of a personal services contract, but the rejecting debtor must still pay the customary damages for breach. *See Pilgrim's Pride*, 467 B.R. at 876-79, 882.

[27] *Accord Pilgrim's Pride*, 467 B.R. at 876 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 530 (1984)).

with Code section 502(b)(7)(A), Lawrence is entitled to one year's salary following the time of the Conversion, or $130,000.00.

However, Lawrence is *not* entitled to the additional $65,000 of "2009 remaining salary" under Code section 502(b)(7)(B). *See* Claim at 2. Section 502(b)(7)(B) entitles an employee to "unpaid compensation," but Lawrence does not claim that Debtor failed to pay him for services rendered in the first half of 2009; rather, he seeks the salary he would have received had he remained employed by Debtor for the remainder of 2009 following the Conversion, *plus* an additional year's salary. In other words, Lawrence seeks a year and a half's worth of salary for the period following the Conversion; he is not seeking unpaid compensation for services rendered in the first half of 2009. Allowing the full amount of Lawrence's salary claim would exceed the statutory cap set by Code section 502(b)(7), so the court will allow only $130,000.00 of the salary portion of the Claim.

*2. Benefits*

Lawrence also claims $32,500 in benefits for his 2009 vacation, health insurance, and expenses relating to use of a truck.[28] The question is whether Lawrence may recover these benefits given the cap set by Code section 502(b)(7). In other words, does section 502(b)(7) limit Lawrence's possible recovery to his salary alone, or are fringe benefits included as part of Lawrence's compensation?

In answering this question, the court is aided by the decision reached by the United States Bankruptcy Court for the District of Massachusetts in *In re Malden Mills, Industries, Incorporated*, 302 B.R. 408 (Bankr. D. Mass. 2003). The *Malden Mills* court declined to take a

---

[28] $5,000 (Vacation 2009) + $19,200 (Health Insurance) + $6,000 (Truck) + $500 (Truck Insurance) + $1,800 (Truck maintenance and fuel) = $32,500. *See* Claim at 2.

15

"limited . . . view of compensation, and held that '[g]iven the expanding and creative methods of compensating employees, . . . compensation may include things other than salary,'" including car allowance, health insurance, and vacation benefits, "'so long as those things can be readily determined under the contract at issue.'" *Id.* at 411 (quoting *In re Interact Med. Techs. Corp.*, No. 98-42912, slip op. at 14 (Bankr. D. Mass. 2003)). The court concluded that the employee in *Malden Mills* was entitled to recover unpaid vacation wages. *Id.* at 413-14 (citing Code § 502(b)(7)(B)). Other courts agree that employees may recover benefits in addition to salary under section 502(b)(7), provided that the recovery is capped at one year's worth of benefit pay.[29]

Like the employment contract at issue in *Malden Mills*, *see id.* at 411-12, it "can be readily determined under"[30] the Agreement that Lawrence is entitled to the benefits he requests as part of his compensation package:

> While employed by [Debtor] (both during the Term and thereafter), [Lawrence] shall be allowed to participate, on the same basis generally as other employees of [Debtor,] in all general employee benefit plans and programs . . . Such benefits, plans, and programs *may include, without limitation*, *medical, health, and dental care*, life insurance, disability protection, and pension plans, as applicable . . . .

Agreement § 2.2 (emphasis added). Although this section does not explicitly mention vacation pay or a vehicle allowance, the phrase "may include, without limitation" implies that the list of benefits was intended to be nonexhaustive. Because it can be discerned that Lawrence was entitled to an array of benefits under the Agreement, and because Code section 502(b)(7) permits former employees to claim fringe benefits, Lawrence is entitled to the $32,500 in benefits he claims.

---

[29] *See, e.g.*, *Anthony v. Interform Corp.*, 96 F.3d 692, 693 (3d Cir. 1996); *In re Verasun Energy Corp.*, 467 B.R. 757, 762, 763 n.10 (Bankr. D. Del. 2012).

[30] *Malden Mills*, 302 B.R. at 411.

Thus, in total, Lawrence is entitled to $162,500.00: $130,000.00 in salary plus $32,500.00 in benefits.

### D. Status/Priority of Lawrence's Claim

Even though Lawrence is permitted to recover part of the Claim, the Claim is *not* entitled to administrative expense priority. The Claim will be paid as a general unsecured claim if sufficient assets remain. *See* Code §§ 507, 726(a).

Code § 503(b) provides "there shall be allowed administrative expenses . . . including – the actual, necessary costs and expenses of *preserving the estate* including – wages, salaries, and commissions for services rendered after the commencement of the case . . . ." (emphasis added). The Agreement was a post-petition contract that Lawrence and Debtor entered pursuant to the Plan. Agreement, at p.1; Confirmation Order ¶ 33. Although a claim for the breach of a post-petition contract is often afforded administrative expense priority,[31] if a post-petition contract claim did not "ar[i]se from a transaction with the bankruptcy estate (as opposed to the pre-bankruptcy entity)" that "directly and substantially benefitted [sic] the estate," the claim is not entitled to administrative priority.[32] Lawrence's services to Debtor under the Agreement could not possibly benefit the estate because the Agreement was entered pursuant to the Confirmation Order, and "[u]pon confirmation of [a chapter 11] plan, the estate cease[s] to exist." *Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351 (5th Cir. 2008)

---

[31] *E.g., Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir. 1998) (citing *In re DAK Indus.*, 66 F.3d 1091, 1093 (9th Cir. 1995)).

[32] *Pinson v. Bishop (In re Lodestar Energy, Inc.)*, Civil Action No. 06-415-KSF, Bankruptcy Nos. 01-50969, 01-50972, 2007 WL 2903036, at *7 (E.D. Ky. Sept. 27, 2007) (citing *In re Sunarhauserman, Inc.*, 126 F.3d 811, 815 (6th Cir. 1997)).

*See also, e.g., In re Pilgrim's Pride Corp.*, 467 B.R. 871, 876 n.7 (Bankr. N.D. Tex. 2012).

(citing Code § 1101(1); *In re Grinstead*, 75 B.R. 2, 3 (Bankr. D. Minn. 1985)). In other words, because the effective date of the Agreement coincided with the effective date of the Plan,[33] nothing Lawrence did after entering the Agreement could benefit the estate because there was no longer any estate to benefit.[34] Additionally, the Agreement was never formally approved by the court; nor did Debtor enter the Agreement with Lawrence in the ordinary course of business. The Claim therefore cannot be treated as an administrative claim. *See* Code § 503(b)(1)(A). Because a post-petition claim that is allowed but not afforded administrative status must be treated as a general unsecured claim,[35] the Claim will be afforded general unsecured status.

## IV. CONCLUSION

For the foregoing reasons, the Claim is hereby **ALLOWED** as a general unsecured claim in the amount of $162,500.00.

**IT IS SO ORDERED.**

---

[33] *See* Agreement at p.1.

[34] *See also In re Benjamin Coal Co.*, 978 F.2d 823, 826-27 (3d Cir. 1992) (holding that where a chapter 11 case had been converted to a case under chapter 7 following confirmation of a chapter 11 plan, the creditor "had only an unsecured non-priority contractual claim based on the terms of the plan").

This is analogous to a case under chapter 9; "[b]ecause a chapter 9 debtor's property remains its own and does not inure into a bankruptcy estate as provided by [Code section 541], there can be no administrative expenses for 'the actual and necessary costs of preserving the estate' as contemplated by [Code section 503(b)(1)(A)]" because by definition there is no estate to preserve. *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 141-42 (Bankr. S.D.N.Y. 2010) (citing 6 COLLIER ON BANKRUPTCY ¶ 901.04[13][a]; NORTON BANKRUPTCY LAW AND PRACTICE § 90:3).

[35] *See, e.g.*, *NLRB v. Greyhound Lines, Inc. (In re Eagle Bus Mfg., Inc.)*, 158 B.R. 421, 435 (S.D. Tex. 1993); *In re D.M. Kaye & Sons Transp., Inc.*, 259 B.R. 114, 118 (Bankr. D.S.C. 2001) (citing *Marriott Family Rests., Inc. v. Lunan Family Rests. (In re Lunan Family Rests.)*, 195 B.R. 429, 450 (Bankr. N.D. Ill. 1996)); *In re United Dep't Stores, Inc.*, 49 B.R. 462, 467 n.5 (Bankr. S.D.N.Y. 1985).